My name is Bill Peterson for the appellants here at Pacific Power Company, Your Honor. Okay, but then you're the cross-respondent. Also the cross-respondent. Yes. So do you want to reserve any time? I was, as a cross-respondent, going to reserve time. Well, so do you think five minutes you want to reserve for something? Yes, that's what I had in mind. So what I would suggest for both sides, that you can use your 15 minutes before for whatever, you know, just to talk about the case generally. And then you've got your five minutes to rebut whatever you think that you need to rebut. And if either, if any of the judges have any additional questions when both of you are done, of course, they'll be free to ask those. Okay, thank you, Your Honor. Did you ever try and settle this case? Did we try to settle the case, Your Honor? We tried to settle the case many times, yes, Your Honor. Did you do Ninth Circuit mediation? We did not have a Ninth Circuit mediate. There was something on the docket about that, but for whatever reason, it didn't go through. We had a telephone conference, and the insurance company, in this case, indicated that they did not believe that the mediation would be useful, fruitful. So we did not have, we had a conference, but we did not go through the mediation process. All right, well, we're going to do argument here today, but I'll be curious at the end of this if whatever we decide is going to be the end of this damn case. Well, I'm sorry to hear that, Your Honor. I'm hoping it would be. All right, go ahead and proceed. Once again, Your Honor, for the record, my name is Bill Peterson. I'm from the law firm of Morris Peterson, and we represent the Appellant Cross Respondents here, a Pacific Power Company. It's an investor-owned electric utility operating in Nevada, mostly in Nevada, but also has a service territory in the state of California, property in the state of California, which is where this loss occurred. By and large, we were very satisfied with the trial court's rulings with respect to the coverage issues, which were the issues that were mostly controverted during the course of the litigation, did not really get resolved until the pretrial order, when most of the coverage issues, which consumed I would say 95 percent of the litigation, was resolved. The issues that were remaining for trial, of course, had to do with the time limits imposed on the company, as alleged by the insurer under the policy to rebuild this. Now, are you still building? Are you continuing? Are you building now? We are, Your Honor. Okay. You are or you aren't? Well, when I say we are, Your Honor, we are spending money. We are continuing with the process. It's extremely difficult in the state of California, if you're not familiar with building in the state of California, to get anything built. The processes are enormous, but we are in the process of getting things permitted. We have not put hammer to nail. We have not put the … Well, Mike, the district court order awarded you $4 million or something for some of the permits. Yes. But you haven't seen that at this point. We have not, Your Honor. No. Let's just say even if this court were to affirm that part of the ruling, that still doesn't resolve the issue. There was evidence in the record of a replacement cost of $19.8 million. Yes, Your Honor. Correct? Yes, Your Honor. And the $4 million was involved in the permitting.  It's included within the $19.8 million. But let's just say if even if this court were to affirm that, it still doesn't seem to address the issue of whether you get paid before you get anything done. The insurance company seems to be of the view that this policy is if in fact there were ordered to do that, you would only get reimbursed after you've completed replacement. Yes, Your Honor. That's their main argument on the $4 million, that it's premature to pay it, because it is an indemnity policy. In the view of the insurer, Mr. Bland, an excellent lawyer, could speak for himself, but I believe the position is because it's an indemnity policy, they indemnify you after the fact, after you have completed. That's their position. And so if you were to order the $4 million to be paid, it still would not resolve the issue as to whether or not there's... Whether they have to pay you as you go on the $19 million. Yes. Well, I think if the court were to affirm the $4 million, I think that would stand for the proposition that the policy should not be construed to require completion of the entire facility before ongoing expenditures are reimbursed. Are they entitled to some guarantee that the money, that you will ultimately use the money to build the dam? There's really two questions in that, Your Honor. I think, and I'm going to give you two answers to that. One is this, and that is the $4 million unquestionably was expended in connection with building the facility. Most of it was permitting, which the trial court, Judge Hicks, indicated, well, that's covered within the concept of repairing, rebuilding, and replacing the dam. If you've got to get the permits, that's part of it. So they have some assurance in that regard. With respect to the rest of it, though, that's really part of my appeal, and that is whether or not if we elect or whether you agree with Mr. Bland that the time has expired to rebuild this dam, notwithstanding what Judge Hicks said, then what do we get? What do we get? And that's the issue that we have brought to the court, which is the determination of the actual cash value, which is what we get if we do not build. And I believe we're entitled to get the actual cash value if we wanted the actual cash value, and we could do anything with it that we wanted to do with that actual cash value. We could build a different power plant. We could build a geothermal plant. We could do anything. Okay. Now, but the district court seemed to fix the actual cash value at 1.261,200. That is correct. Because the district court seemed to, that was an amount that was, okay, agreed. Now, I know that that's disputed on some level. Agreed upon early in the proceedings, not in 2003, but early in the proceedings. Around 2001 is what the trial court said. And the district court also basically said other things in terms of how you would calculate the replacement value and, you know, how that would. That's the problem, Your Honor. You're focusing right on the problem, and it's this. The judge, the way the policy is structured, it's an indemnity policy, and it's not really much different from a homeowner's policies, and that is, you know, we will pay you, Sierra Pacific, if you want to rebuild this dam, the replacement cost. If you don't, we're going to write you a check anyway because you've lost it, and it's a total loss, and you're entitled to get whatever the valuation provision is in the policy if you don't rebuild. Now, what the trial court did with respect to that number, and that is why I'm here. I'm saying to the court, if we. You're arguing that you're entitled to 19.8. That's correct. Which I can't find any authority for the fact that all of the calculations seem to talk about depreciation in all of them. I don't find. I'm not finding one case that says you're entitled to 19.8. What's your best case on that? Well, the best case on that is the California case law, Jefferson, which is the lead case on point, and what Jefferson says is that for insurance policies issued for losses of property covered in the state of California. But subsequent California cases have clarified that Jefferson cannot be read to mean that the legislature did not intend to limit ECB to replacement costs less depreciation. Like if you look at Cheeks. Right. Cheeks actually was decided after this policy was issued. I can hardly give guidance to the parties in this case, but apart from that, what Cheeks says is if the insurance policy itself has a provision in it that says actual cash value, and it does not provide for depreciation, as did the Anacin Hughes case, if it doesn't say that, then insurance company, you can't take depreciation. Now, this. Well, it just seems that both of you bring this with a posture. You're saying I'm entitled to 19.8. Right. And no depreciation. They're saying that you're only entitled to 1.261 because you agreed upon that, even though the district court seemed to go beyond that and say that there weren't agreements to certain things. And. Yeah. Let me frame it this way with respect. So it's like either you get a dollar or you get a million dollars, and we're supposed to. But we have to review it for, you know, what. Right. That pesky old law. Right. Well, actual cash value, as I pointed out, has a long history in the state of California. The terminology is actually defined in the code. And the code says even if you provide for something different, for policies that cover these kinds of losses, which include fire in the state of California, this is how it's defined, actual cash value. Now, that's how it's been interpreted for a long time. Now, come along Cheeks. And Cheeks says, well, wait a minute. The parties can actually agree, if they want to, to a different form of reimbursement. And actually, in a footnote in Cheeks, they use the precise language that appears in this policy, which was actual cash value with depreciation, with appropriate deduction for depreciation. I don't understand that. If actual, I mean, I find this concept difficult. If actual cash value is fair market value, then fair market would normally take into account depreciation. You know, you're exactly right on that. I don't understand what this clause means, if actual cash value is fair market value, since fair market would reflect the current condition of the dam. You know, that is an excellent point. And I think maybe you're thinking about this because, in my view, the lead case on this issue is not in California. It's out of New York. It's out of your jurisdiction. And that's McInerney versus Newark Life Insurance Company, which, by the way, has the identical policy language in it as this policy does. And Cardozo decided that case along with Judge Pound. That was 82 years ago. And Judge, they didn't write the opinion. Somebody else did. But this judge that wrote the opinion said, that seems to be a redundancy here. It's actual cash value with appropriate deduction for depreciation seems to be a double dip on the depreciation. Because fair market value, if actual cash value means fair market value, then fair market value already includes a deduction for depreciation. And therefore, you're taking it twice. And therefore, actual cash value cannot mean fair market value. And that's when New York adopted one of the three tests for actual cash value, which is called the broad evidence test, in which the judges in New York said, look, this clause is vague and ambiguous. The court should consider, the jury, actually, in that case, should consider multiple factors in coming to a determination of what actually should the insured recover on a loss. In that case, it was of a brewery. And it was after prohibition was enacted. And the issue was, well, the fair market value of a brewery after a prohibition is about zero. Well, now, okay. The $19.8 million, is that really, even though, you know, whether anyone gets it or what it means, but that as replacement value, that's not really in dispute, right? No, that was undisputed in Toronto. All right. What was? I just want to be sure. The $19.8. The actual cost to replace was $19.8. If you have to do all of the, you know, the sequel. Which we have to do. Well, right. You know that now. Right. And when there was, if there was an agreement of the 1.261200, that was before, at that time, it was thought that maybe it could just be rebuilt without going through all of this permitting and all of that, right? Yes. What happened is, and I want to come back, because I want to make sure the court understands this point. The judge never, the judge said there was no agreement on actual cash value at all. And that finding is. Again, he said that you weren't bound by that agreement, but then he picked that number as that ACV. Yes, that's the point I want to make. And if you look at page 10 of my brief, I reproduce the most important piece of evidence in this case on that issue, because this is what the judge did. The judge in his findings didn't say where this number came from. He didn't even explain how it was calculated. He just gave the number. So I went back on. Well, I think we know where it came from, because it exactly matches what the number was before. Well, that's. But it doesn't sync with all of the other discussions. No, it doesn't, Your Honor. So we went back to Judge Hicks, I did, on a motion and said, I think it's a typo. I don't know where you got this number. I had, during the interim, figured out where the number came from. He came back in his order on my motion and said, well, I think the number came from an internal email that was exchanged between our broker and our internal claims agent discussing whether we should accept the actual cash value number that was proposed by the insurers in this case. It was an internal memo. That's what he relied upon. That internal memo, which is reproduced on page 10, was a memo that included the insurers' calculations, and it was very simple. What the company did after the flood, this 100-year flood loss and the dam was destroyed, did a back-of-the-envelope, sent an engineer up there on a back-of-the-envelope calculation, what it's going to cost to replace what's here in the river. That number came out to be about $2,060,000. That's what that number was. Back-of-the-envelope, no bids, no permitting, no investigation. Would that have been more a reproduction cost as opposed to a replacement cost? It would be. The guy looks at some concrete in the river. You bring a contractor out there, granite construction. He looks at a bunch of concrete in the river and says, look, I could probably haul that concrete out, and I could divert, we have to dewater the river, we have to rechannel the river away from where the dam is, replace the dam, I can do a lot of excavating, replace the dam and do it. I can do it for $2,060,000 is what that number was. The problem was it's not a real number. It was a ridiculous number. You can't go in the Truckee River and dewater it or rechannel the river and then get all your permitting for $2,000,000.  But the trial court took that number, that $2,000,000 number, reduced it by a depreciation factor because the dam was old, it depreciated it by about 50%, and that's where that number came from. The judge didn't even say it came from an agreement. The judge said it came from this internal memo was where it came from. He admits that there was no agreement. I mean, he finds that there was no agreement. So my main contention is, look, back to your original point about the depreciation, it's hard to get around that because it actually says that in the policy. So we had two answers to that. One is in California it says, look, you've got to apply the actual cash value rule in the state of California. It means fair market value. If you go with cheeks and you say, well, you can agree to something different, then what they used was replacement cost, less depreciation. Do you want to save the balance for your rebuttal? I just want to say one other thing. Sure. And that is, but the replacement cost that they used was not the replacement of what's there, but actually to restore to the insured what it is that he had there, and then they deducted a depreciation. If you do it otherwise, Your Honor, it's also a double dip. In other words, if you say I'm going to just replace exactly what's there, the old concrete, stuff like that, and depreciate it, that's also a double dip in depreciation. What we're saying is if you want to go that way, then it has to be, and cheeks itself used full replacement cost with a depreciation factor. Well, you want $19.8 million, but you would accept $19.8 million minus depreciation. Minus what? Depreciation. And there was evidence on depreciation, Your Honor. That wasn't the question. I'm sorry? That wasn't the question. She said would you accept $19.8 million minus depreciation. We told the trial court that. That's why we put evidence on depreciation, Your Honor. And that's in the record, too. And what's in the record is. So the answer is yes? Yeah, the answer is yes. Yeah, the answer is yes. But I have to put a caveat on it, and that is it's not tax depreciation. It's not book depreciation. Depreciation in insurance law everywhere is obsolescence. It has to do with, you know, whether it's not functional or things of that nature. Well, we're not going to make that determination. We're looking at the legal issues. So I would reserve your time if I were you. Thank you, Your Honor. Still morning. Good morning, Your Honor. Good morning. I'd like to reserve time as well. My name is David Bland, and I'm here representing Defendants Zurich and Hartford-Steen Boiler. I think we need to talk about what this case is about. This case is about whether the term actual cash value includes code upgrade costs. The $19.8 million is to put back a dam that is current with codes. The codes have changed, as I'm sure you can well imagine, since this dam was built in the early 1900s. So the question is, if they don't replace, do they get replacement costs with code upgrades? That's what this case is about. The other part of this case is about whether the two-year limit. And I don't understand the first part. If they don't replace, what does that mean? There's two possibilities here. The policy says if you replace, we'll pay you replacement costs. Right. If you don't replace, we'll pay you actual cash value with proper deduction for depreciation. But you want to calculate actual cash value as $1.2 million. Here's how we say the policy works. We say replacement cost is to put back as was, where was, which we calculated at $2.4 million and then deducted the depreciation. But that's reproduction cost. That's replacement. There's a difference between reproduction cost and replacement cost. No, there isn't. So why would you get – if all you're going to get – this is a replacement cost policy, right? Correct. And you pay more for that than one that's not replacement cost. Correct. So why would you pay more for a policy that just gives you the exact same thing, even though you can't – they can't build the exact same thing? Because the law says so. California Statutes 2071, which they rely on so heavily, where they're saying actual cash value is defined as fair market value, which it was in Jefferson, because there was no other definition in the policy. The statute says to the extent of the actual cash value of the property at the time of loss, at the time of loss, but not exceeding the amount it would cost to repair or replace the property with material of like kind and quality within a reasonable time. Here comes the key part. Without allowance for any increased cost of repair or reconstruction by reason of any law or ordinance regulating construction or repair. Insurance policies. And this came, Your Honor, from New York. This started as a New York statutory fire policy in 1942. And many states have adopted it, some with minor changes. But that's the origin of it. Policies have never covered code-mandated upgrades. It's to put back what you had. How they do it – But they can't put that back. I understand. But how they do it – So that's why the court said it was – I mean, so essentially it's an illusory policy. They're saying it would be against public policy because to put back what they had, no one would let them put back what they had. So – No. It's provided for in this policy. We provide a provision called demolition and increased cost of construction. We provide code upgrade coverage sublimited to $10 million. So what the way the policy works is the way policies work for all kinds of – flood is excluded and then added back with a sublimit. Earthquake is excluded and added back with a sublimit. Because keep in mind the policy we have here is all risks of physical loss or damage. So if you want to say we'll cover your earthquake but only for the $5 million because if there's another earthquake in San Francisco, we've got 150 insureds here. And we can't pay them all $250 million or we'll be out of business. So you add it back with a sublimit. What they want to say is that even if we don't rebuild, we get the replacement cost, which isn't the law here, it's not the law anywhere, and it's never been the law. And to say that the $2 million figure was a back-of-the-hand calculation, here's their calculation. It's at ER 385. Now, your reliance on that is you're saying they agreed to that and it was a foregone – No. Are you saying that they agreed to that? No. The trial court judge found they did not agree to it. But he is the finder of fact. He's the jury here, too, because he tried the case without a jury. The question of law he had to decide is how is ACV measured. The question of fact he had to decide is what is the amount that meets that measurement. He decided the measure was $1.2 million. It didn't matter whether it was agreed upon or not. He said they never agreed it was the number, but I find, as a matter of fact, it actually is the number. And what I'm confused about is there are two separate clauses. One provides for the cost of repair and replacement without a deduction for depreciation, and the other says in the event that they don't – there's no – this doesn't take place within two years, then it's the actual cash value. Correct. What applies here? I thought that he said that the actual cash value is not appropriate in terms of if you're defining it as fair market value because there's no market for a dam. So he was going to go back to essentially the valuation that appeared in paragraph 6. Well, I think the problem here, Your Honor, is that throughout this case everybody has been mixing apples and oranges. That's what seems to me, but I'm trying to understand in my head anyway. The fair market value concept only applies if the policy doesn't say something different. Here's what Cheeks said. Cheeks said if an insurer wants to determine actual cash value on the basis of replacement cost, less depreciation, all it has to do is say so in the policy. And then footnote 5 goes on to say use words like actual cash value with proper deduction for depreciation. Those are the exact words that appear in our policy. So what Cheeks says is that's how you move from fair market value as the definition to replacement cost, less depreciation. So you're saying your policy is so clear and not subject to ambiguity that the district court was confused and maybe three appellate judges are confused. Well, that's what he did. He applied it as replacement cost of 2 point some million, less depreciation to get to the 1.2 figure. It wasn't a number he pulled out of his head. But then he said they can rebuild and he gave them $4 million. Well, the problem with that is that was never an issue in this case. Mr. Peterson's own words twice to the court, the trial court, he's talking about our renewed motion for summary judgment. The renewed motion argues at length that Sierra is not entitled to actually recover its expenditures until repair, rebuild, or replacement is complete. This was never contested by Sierra and Sierra concedes as much today. That's at ER 526. He says it again, requiring actual expenditures as a condition to recovering replacement costs but denying recovery until replacement is complete comports with common sense, logic, and policy. But if the court said that they're entitled to it, that does not fit into your interpretation of the policy. I agree. It does not. All right. So the interpretation that you're saying is so clear on its face, the court is not accepting that interpretation of what the policy calls for. Well, it's one thing. I mean, this was never argued at trial. It's not covered in either trial brief. It's not covered in the pretrial order. There was never any discussion about whether this $4 million should be paid now or later. They never raised it at trial. We never defeated it. I mean, we never litigated it. The trial court just pulled this one out of his hat and said, oh, and by the way, I heard this evidence that there was $4 million expended, and you get that whether you replace it or not. He simply can't do it. That's clear error. The policy says you get this at this point in time, and if you go ahead and rebuild, then you get this much more. Could I understand? I have two clauses that I have in front of me. Paragraph 6 on the valuation and paragraph – well, and it's 6A and 6B. One talks about replacement costs essentially without deduction for depreciation, and one talks about in the event of loss or damage, which is not repaired within two years, then you get into this actual cash value. Which clause are we – do you say is applicable here? 6B, because it hasn't been replaced. It wasn't replaced within the two years. It wasn't replaced within all the extended periods of time we gave them. So it hasn't yet been replaced. But aren't you trying to pull something out of C and import it to another section? No. No. The policy is very clear. The cost of repair replacement without deduction for depreciation subject to, in the event the loss or damage is not repaired within two years, the company is only liable for – or not liable for more than the actual cash value with proper deduction for depreciation of the property destroyed. So, again, I want to understand. And then it's not done within two years. In fact, you gave them multiple extensions. Correct. Did you ever turn them down? I don't remember. They just let the last one expire. And they didn't even ask you for another extension. Nope. Not one. Think about the World Trade Center. Many years ago, they haven't rebuilt that building yet. There are some cases where – I mean, if your house burns down, you can – if a factory down the street burns down, you may be able to rebuild it within two years. In the situation where you can't, the insurance company, as you well know, is obligated to deal fairly and in good faith with its insured. They came to us and said, look, we're having all these problems. We've got permits. We know. We understand. Here's an additional. Come back. We've got all these problems. Okay. Here's an extension. Come back. Here's an extension. But by that very conduct, you're acknowledging that the two years is not really enforceable because otherwise – I mean, that's why you gave them more time, because of your obligation to act in good faith. What you really – isn't the fact that you gave them these extensions a recognition that this two years doesn't necessarily really mean two years? Well, there's nothing that prevents two parties to a contract from varying their contract. It is enforced religiously when it can be accomplished. When it can't – And the Court found it was impossible. Well, an impossibility is measured at the time the contract is entered into. And what they had to prove and couldn't because they admitted to the contrary was there was no – But the Court ruled that the two-year condition was impossible to satisfy and it would be contrary to public policy to enforce it. I understand. But it was never a two year. It was extended until they stopped asking. And there's a good public policy reason for it. How long can they wait? A hundred years? I mean, when we're all dead and gone and my son and his daughter are now living – No, I thought there was a clause in the policy that put a cap that it had to be within – I don't have the clause in my head at the moment, but it had to be as of the time it could have been diligently completed. So it wasn't open-ended. You had a date, kind of a fixed date, that depended on when they could have diligently completed it. I mean, I found your argument when I read it in the brief persuasive on this, but then there is a way that your liability is capped that doesn't go on for a hundred years in terms of what you have to set aside or what your exposure is. I understand the argument that 10 years from now it could cost $38 million to construct it, but as I understand the policy, there's a provision that says that it's a liability as of the replacement cost, as of the date that it could have been reasonably and diligently constructed. That's the calculation number. There's no deadline number. That's the difference. The number is calculated at a point in time, so they can't not do it for a hundred years and try to use a hundred years later price. Right, right. There's nothing that says when they have to do it if you don't enforce the two years. Then it's open-ended, it's indefinite, and they could take a hundred years and all of a sudden come back to our insurance company when all the witnesses are dead and gone and say, we want our replacement cost now, we finally decided to replace it. The insurance company, I mean, I'm assuming that, I mean, this isn't in the record, but it's just common knowledge. These policies are reinsured and reinsured and reinsured. Of course. You know, how long do these carriers have to keep their files open? How long do they have to keep their reserves posted? Keep the reserves up for a hundred years? Well, we're talking about, again, a reasonable amount of time. Are you saying that the amount of time that was taken was unreasonable given the administrative hurdles and the bureaucratic hurdles that anybody faces in trying to build in California or New York for that matter? They had all the permits in place in 2003. All the permits. There's testimony in the record, all the permits were in place in 2003. They just decided not to do it. The problem is they don't want to rebuild this dam. They do not want to rebuild it. They want to get paid replacement costs, $19 million, but not rebuild it. We're happy to pay them what the policy says when they rebuild it. But at some point, you know, either they had to come back to us and say, you know, this last extension is expiring, we really need more time. They could have gone to the trial court and said, judge, deal with this issue. They never did. They just stopped everything and sued us. So let's assume they said, we'll make an agreement with you. We're going to rebuild it. And this is, you know, we'll rebuild it by this in the state. You're willing to pay them $19 million? No, Your Honor, we're not because we don't think $19 million is the number. But you would be willing to pay them the number? Code upgrade coverage is limited to 10. But let's assume you're wrong. I mean, I understand your – I'm just trying to understand your position. And your position is that you would pay the replacement cost if they were – if you were certain that they were going forward and replacing it. That's been our position every time. They asked us for extensions. We said, sure. We said, sure. They finally stopped asking and just said, forget it. We think we're entitled to the whole thing anyway. And let's go fight this out in a lawsuit. Counsel, Judge Gould, could I please ask you a question? Certainly, Judge. About this policy. When it provides for replacement costs, but you take the position that – or your clients take the position that that doesn't include any regulatory costs, does that mean that if the laws have changed, they can't replace a dam that generated a certain quantum of power with another dam that generates the same power? No, they can replace the dam. Here's the key provision that seems to have been overlooked so far in our discussion. It's in the policies on page ER-248. It says, this policy does not insure against loss or damage caused by or resulting from any increase in the loss due to any ordinance, law, or regulation, rule or ruling restricting or affecting repair, alteration, use, operation, construction, or installation. Now, is that part of the DICC, the demolition and increased cost of construction? No, that's an exclusion. On page ER-245, we find the – and it's page 18 of 29 of the policy, if that's the numbers you're looking at, Your Honors. We find the added coverage for demolition and increased cost in construction. And what it says is, if at the time of the loss, there is in force any law or ordinance regulating the construction, repair, replacement, or use of the property, then this policy is extended to cover, and it lists three things. B is what's important here. The cost actually incurred in rebuilding both the damaged and demolished portions of the building to satisfy such law. But it is subject to the sublimit of liability specified in the declarations. It's not an open-ended grant of coverage. Kagan. Well, okay. Let me – I'm just – it seems to me that Sierra is arguing, as it did in the district court, that it is ultimately entitled to the full cost to replace the Ferret Dam, even if that cost is more expensive due to changes in building codes or other regulatory requirements. Right? And the district court agreed and ruled that the replacement cost coverage of the dam includes design fees, permitting fees, and other regulatory costs necessary to rebuild. And the court also ruled that the coverage available to Sierra included the increased cost of construction based on intervening changes in the law. You would disagree with that, and you cite an exclusion in the policy that you contend explicitly eliminates that coverage. No. No? I agree with it up to $10 million. I agree that we have code upgrade coverage for the $10 million of the sublimit. They say we have – Counsel, it is a – if I understand this, you're saying that you agree they get that coverage, but subject to a cap that's specified in the policy. That's absolutely correct, Your Honor. $10 million. Let me ask – let me ask a question on this. Does this record contain evidence of how these particular policies were underwritten? Yes and no. Yes to the extent that they had a broker who interfaced with the insurance company's underwriters. The broker was deposed. His testimony was put in the record by way of deposition. Our underwriter was put in by way of deposition. The claims people, one, wasn't put in at all. The main claims person testified live at trial. So, yes, there was evidence exactly of how the policy was procured. And what's incredibly interesting, to follow that point up for a minute, is in the very specifications that they set forth when they came out to the market to ask for this policy, they asked for the exact same thing they got. They asked for ACV to be measured as replacement cost at the time of loss of the damaged or destroyed property less depreciation. They asked for a clause that says virtually identical language to what we said. If the property is repaired, we get replacement cost. If it isn't, we get ACV, and here's how we define ACV. So it's not like this is some big secret. If they wanted their dams valued differently, if they wanted them valued at, you know, code upgrade cost, whatever. I mean, we're talking about 100-year-old property. Everybody knows you can't put it back the way it was. So you agree that if they had gone ahead, you would have been liable, and within the, let's say within the two-year period of whatever is reasonable, you would have been liable for replacement costs without a deduction for depreciation. They would have gotten back the difference between the 2 million and the 1 million that was paid. There was 700,000 of depreciation deducted from that, plus 10 million for code upgrade costs. That's what we said was left. It can't possibly be that you could, I mean, it's intuitive, I admit. But it just strikes me as, forget about the, you're willing to give them 10 million. It just strikes me as intuitively that you could rebuild this dam, assuming you didn't have huge costs. Let's put aside that you could actually do this for $2 million. I mean, it doesn't make, it doesn't, it just, you can't practically, you could probably, it costs $2 million to build some houses in California. It certainly does. I used to live in one. So I moved back to Minneapolis. They came up with a number that was lower than the number we said was ACV. They came up with a number, I believe it's $1.75 million. $1.75 million. The goal was. But they're not, they're not binding themselves to that now. Well, that's because we're talking apples and oranges still. You said the district court, I mean, I'm just trying to understand all this. You said the district court said they never agreed to that number. I understand that. They just seemed to pull it right out of the air. But the judge. You know, if I was sitting in the district court, I'd be doing these numbers and saying, this case should settle. You're willing to give them $10 million for all of this cost of, you know, the regulatory cost, just to put it under that rubric. It can't possibly cost $2 million to replace this dam. It couldn't have then. It doesn't now. So why isn't, you know, I don't want to get you involved in settlement discussions, but I'm just trying to figure out what's really at stake here. I mean, it seems to me we're talking about a few million dollars difference. Well, it's a philosophical difference between do you, do they get paid, code upgrade costs without actually upgrading. That's the question. Because the 19.8 includes a whole lot of code upgrade costs. Huge code upgrade costs. I'm sure both of you can write a clearer policy now. Well, you could make an agreement, though, but you could agree that you would pay them up to $10 million, for example, if they, if you're there, if they actually go ahead and do this and you'll pay them as they're doing it. Well, we're not going to pay them as they go, I don't think, because that's not what the policy says. But be that as it may, we always said we will. I'm thinking pragmatic, not philosophical. I understand. And my clients are thinking more, you know, what their own internal requirements are. The point is, had they ever actually started turning over a shovel full of dirt, we wouldn't be here. They never have. They haven't as of the time of trial. And I don't, I think Mr. Peterson already told you today, they haven't turned over a shovel full of dirt yet. So if they ever, I mean, we're 13, 14 years out. And they make, they go on at length in their brief about how important this is and how much it was helping them and how, you know, if it was really that important, why haven't they fixed, why haven't they rebuilt? Well, and you haven't paid them any money either, right? We paid them what we're obligated to pay under the policy. Counsel, a question just to clarify. Does that $19.8 million figure, does it include funds beyond the $10 million cap for the regulatory changes you would permit? Yes, unequivocally. It does? Well, it's a pretend number because, you know, until they actually do the work, you don't know how much it's going to cost. It was an estimated number. All right. No one really disputed that there at the trial. Well, there's no reason for us to dispute it because we don't care what they estimate. It's what they actually spent. I know, but he's willing to take, I mean, again, I'm trying to look at it pragmatically. He's agreed that it's, you would take depreciation off that $19 million. I thought your adversary agreed to that. Didn't you say that you were agreeable to? No, no. So off the $19 million comes depreciation. Now, why he's agreeing to this, I'm not sure, because it's not clear in my own mind why you would want to do that. But so off this $19 million comes, from what I could tell, a fairly significant number for depreciation, and you're willing to pay $10 million plus replacement costs. I just don't understand what's being argued over here. They haven't done the work, and they never intend to do it. So that's the problem, isn't it? That's the problem. It's been a problem from day one. Had they rebuilt it, started to rebuild it, done something other than stop in their tracks when they had the permits. So your position is that they never intended to rebuild? They don't own those dams anymore. They've sold them as part of their merger. They had to sell them. That's in the record. So that they can't. Well, this one they saved, but there's been legislation. I mean, this is all off the record, but Harry Reid got a bill passed to pay Sierra some money for these dams. Well, I don't want to go off the record. You've actually used all your time, but I'll give you two minutes for a rebuttal. Since it's obviously this has been the dam case. Do you want to rebuild? I just want to understand. Do you want this money? I mean, just to take a simple example. The company wants it. I had damage to a car on the streets of Brooklyn. The insurance company said, you know, after deductible, we think the damage is $500, and here's a check for $500. We actually never repaired the automobile because we figured we'll live with the damage. Is that what we're talking about here? That what you want is the money, but you don't want to rebuild the dam? You know, Your Honor, it's not an easy question to answer, but I'm going to be very quick about it. It is an easy question to answer. Well, he mentioned to you the Sierra Pacific has actually sold its water business, not our electric, but we did sell the water business. But under the contract, we're obligated to either deliver to the buyer, who is a government entity in Nevada, either a rebuilt dam, or we've got to give them a perfected insurance claim such that they can rebuild the dam. Now, there may be options that TUMWA, that's the buyer of the dam, you know, may prefer rather than actually build what we are required to build in order to replace what we had before. They may not. I mean, I don't understand that they're at all obligated. What you've provided to them is what they want is an insurance. Either you rebuild it or you give us an insurance claim, and they might take the insurance money and not do anything. You know, they might. But, you know, to give you an example about the car that was destroyed in Brooklyn, the carrier is going to pay you the fair market value of that car. You don't have to buy a new car. You could go put it on the gambling tables if you wanted to. And that's exactly what we're saying here. No, but this contract is worded somewhat differently. It's worded in terms of actually going ahead with what they would pay if you actually replaced it and another clause that says if you don't do it within two years, we're going to give you a lot less. We're not going to give you your replacement cost. Well, what they're saying is they're going to give you the actual cash value. Less, whatever that means, but it's less than the replacement cost. So this is not the same thing. I don't understand. It seems to me that if you're not going to rebuild, if you don't have any intention of rebuilding, then this clause B governs and you have to do it within two years or let's say for the moment whatever is reasonable and that you only get the actual cash value, which may be less depreciation, which I agree with you that less depreciation is ridiculous if actual cash value means what a willing buyer would pay. But that's what they say here. There's a difference in this contract between if you're actually going to do it and you're not going to do it. And you're arguing essentially that you're basically entitled to the same thing. Well, that's because of the unique nature of the property because what I'm saying is that actual cash value is fair market value. The California Evidence Code tells you how to do that. You go to comparable sales, you go to discounted cash flow, or you go to replacement cost. What we're saying is there are no comparable sales. Discounted cash flow here because this facility generates millions of dollars every year and the replacement costs are about the same. It's about $20 million. It's only because of the uniqueness of the property that this conundrum arises where it's actually the same number is what I'm saying. Counsel, I've got a question for you on that. Would you agree with your adversary or your opponent that the $19.8 million figure includes costs attributable to regulation that exceed the capped figure of $10 million? We are entitled to more than the $10 million. That's actually where I was going to go next. Counsel has provided to you a portion of the policy. Well, but there's a simple answer to that. The simple answer is that the $19.8 million includes more than the $10 million cap. It includes other costs, right? Yes, it does, yeah. But sometimes you can ask something and answer something with a yes or no and not wander off the reservation. Okay, I'm sorry, but yes. He said the answer is yes, but you're still entitled to it. Yeah, yes, I guess that's the question I was trying to answer, yes. We're still entitled to it for this reason. Counsel has pointed to a provision of the policy with respect to it does not include, you know, code upgrades and things of that nature. First of all, it's not clear that there's any code upgrades mandated that are the cause of this new facility. It's actually an EIS. But secondly, and this is the most important thing I could say here with respect to that rebuttal, is that what he says, and he said it's the most important thing in his argument, if we get actual cash value, it doesn't include the code upgrades. He then points to a portion of the policy where there's an exclusion. What Judge Hicks found, and he's correct on it, which is the lead case directly on point, which is fire exchange, and what fire exchange says, you know, that is a perils exclusion. In other words, when you exclude code upgrades, it's if the code upgrade causes the loss, not an increase in cost. And the prime example of this is typical in building codes all over the United States, where if a certain percentage of your structure is destroyed, the code says you shall tear down 100% of it and start anew. You can't just build up half of it. That's a situation where the loss, and it uses loss, where the loss is caused by the code upgrade, not the cost, then it's excluded. It's a perils exclusion, not a damage exclusion. Now, do you agree with or disagree with your adversary's statement of position as to whether the record shows how this policy was underwritten? No, I don't, Your Honor. And the reason I disagree with him is because this is a Hartford standard form manuscript policy. It was not negotiated. It's an adhesion contract. What he is pointing out to you is we had our broker go out and say we'd like to have this in the policy. What we did put in that and what he has told you is we would like to have replacement cost less depreciation. Well, we didn't get it. What we got was the standard Hartford adhesion contract manuscript form, which is in place in New York and everywhere else in the United States. That's why we had nothing whatever to do with that language. And so does the record show how the insurers underwrote the portion of the policy that's addressed in the camp? No. No, Your Honor. It does not. Could I ask you, what do you say is the depreciation? The depreciation, in my view. How much? You say you put in evidence. How much? Yes. How much? Zero. Zero. Zero. But I can explain it. When you agreed with my colleague before that it was okay with you to take depreciation off the 19 million, what you're really saying is there's no depreciation. It's only because insurance law, and it's in the brief, says depreciation is a measure of obsolescence. It's the loss in value. It's not book value. It's not tax depreciation. What we did is we put our man on the stand and he testified, you know. That the place was in great shape. As all utility plants are. And they have to be. They have to be maintained in tip-top condition to generate 2.7 megawatts of electricity. That's what we were saying. And the other question that I wanted to ask you is why did you stop asking for extensions? Thank you for asking that because I would have forgotten that. Remember I told you at the beginning, 99% of this case had to do with coverage issues. They never offered whether we even to replace it with more than 1.5 million. It's right in their answer to the complaint. They were saying that you can rebuild it if you would like. But the total coverage available under the policy for rebuilding dams is 1.58 million. And no matter what you do, that is the total amount of money you're going to get. We pointed out to them various provisions of the policy, like this 10 million, which they originally said you don't get that either. Because that is a sublimit and is subsumed within the sublimit for total coverage for dams, which they calculated at 1.5 million. So we fought that issue for years. And it was only at the very end when I wrote the last letter to the carrier saying, this is our last attempt to try to get you to provide us with the coverage we think we have under the policy  And they said, no. It's 1.5 million. At that point, we sued them. That's why we stopped asking, because we stopped negotiating as to the coverage issues. Again, most of this case was on, they were originally saying, up to the time of trial. They were saying, you can rebuild it if you want. You only get 1.5 million. We don't care how much you spend. They finally conceded on that is why we went to trial as well. But that is why we stopped asking for that extension. Which is why, Your Honor, the judge said, Judge Hicks said, you know, these coverage denials that went on for years and years were in bad faith. And because those coverage denials were wrongful, which they conceded, because they subsequently said there is coverage, then that time limit is lifted. You can't tell the utility, all you get is 1.5 million. All right. You're considerably over your time. Sorry. All right. I'm going to give you two minutes unless there's any additional questions, which there probably will be. That entire last colloquy by Mr. Peterson is all extra record information. There's no such information in the record. And to say that this is an adhesion contract, Sierra Pacific was represented by Marsh, one of the largest brokers, if not the largest broker in this country. They negotiated limits. They negotiated coverages. They negotiated all kinds of things. The fact that the policy ended up coming out on a partially, at least, there were amendments to it, endorsements added, and you can see those are in the record, came out on a Hartford form is irrelevant. It didn't mean that they didn't sit down and negotiate. This is not a contract of adhesion. They could go anywhere they wanted. They sent this proposal that they put together out to several companies. We'd insured them up to a point. They came back and said, yeah, we'd like to continue to do business with you. Here's what we need. That's the process of commercial brokerage. It is not an adhesion contract. Counselor, Marsh-McLennan, I read something in the briefs about Marsh-McLennan, J&H. Like, is Johnson & Higgins merged with Marsh-McLennan? Yes. Or is it joint venture? No, they merged. Marsh took over J&H, I don't remember if it was before or after this policy was issued. It was close to that point in time. There was a consolidation of a number of brokers, and that was one amalgamation. A&A got somebody else. Does anyone have further questions? I don't. You have 30 seconds if there's no further questions. This case needs to be reversed as to the two-year limitation provision, and it needs to be affirmed as to the $1.2 million decision, and there's nothing else for the trial court to do. That needs to be reversed as to the $4 million, too. You're right. And it needs to be reversed as to the $4 million. Thank you, Your Honor. I think that's part of the reason you came here. That is absolutely the reason you came here. So I thank you all for your time. All right. Thank you. This matter will stand submitted. This court will be in recess until tomorrow morning.
judges: Korman, Gould, Callahan